THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES ALLEN (Impleaded), Defendant-Appellant.

First District (3rd Division) No. 61085

Opinion filed March 4, 1976.

Paul Bradley and Victoria J. Meyers, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Michael Shabat, Laurence J. Bolon, and John T. Theis, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

Charles Allen and Curtis Henderson were indicted for the attempt armed robbery and murder of Charles Hayes. A jury found them guilty of both crimes and they were sentenced to concurrent terms of 5 to 10 and 40 to 80 years. They have prosecuted separate appeals. Allen challenges the verdict on numerous grounds—the principal ones being that reversible error was committed in denying his motion for a separate trial and in allowing into evidence out-of-court statements incriminating him in the crimes.

On the night of October 18, 1972, Charles Hayes and his wife were shopping in a grocery store at 308 South Kostner Avenue, Chicago. About 11 p.m., Allen (16 years of age), Henderson (15 years old) and two other youths, Paul Bardney and Terry Davis, entered the store. Upon completing their shopping the Hayeses left the store and walked to their auto which was parked near the front door. The four youths followed them out. As Hayes was assisting his wife into the auto he was accosted by two of them, one of whom was armed with a sawed-off shotgun. Mrs. Hayes was told to keep quiet or they would "let him have it." While the youth with the weapon kept him covered, the other went through Hayes' pockets. Hayes attempted to seize the gun and was shot in the abdomen. He died instantaneously from the shotgun blast.

Henderson, Bardney and Davis were arrested the following evening. They attempted to flee as the police approached them but were seized, taken to a police station and questioned. They admitted being in the store prior to the shooting but denied being involved. They implicated Allen and the police started looking for him. They found him asleep on a closet floor in an apartment occupied by his uncle and aunt at 305 South

Kostner Avenue, across the street from the grocery store. He was asked if he knew where the shotgun was. He said it was inside a refrigerator on the back porch. The police found the gun used in the shooting and another shotgun in an abandoned refrigerator that had been turned to the wall. Later, Allen told the police that Bardney did the shooting. When the police accused Bardney of the crime, he said that Allen held up Hayes and shot him.

After they were arrested the four young men were placed in lineups. Henderson was pointed out by Mrs. Hayes as the man who searched her husband, but she did not identify Allen, Bardney or Davis.

Mrs. Hayes and Bardney testified for the State. Mrs. Hayes said that Henderson was the man who went through her husband's pockets, but that she was not in a position to see the man who held the gun. Bardney testified that he saw Allen walk up to the Hayes' auto, saw Hayes grab Allen, heard a shot and ran away. He ran to Henderson's home which was just around the corner. Allen came there 15 minutes later with a 16-gauge shotgun. Bardney admitted that the gun belonged to him, but said that he had left it with Allen the afternoon of the shooting and had not seen it at the time the shooting occurred.

Davis, a defense witness, testified that he saw a barrel of a shotgun protruding from Bardney's coat sleeve before Bardney and Allen followed the Hayeses out of the store. He stated that after the shooting, at Henderson's home, Bardney told him that he shot Hayes when Hayes started to choke him.

Henderson testified in his own behalf. He said that he was in the store when Allen and Bardney came in and remained there after they left; that he was inside when he heard the shot and that he and Davis rushed to the door, saw Hayes on the ground and ran home. Allen and Bardney were already there when they arrived.

Allen testified that he left the store before the Hayeses did. He said Bardney followed them out and when he saw a shotgun in Bardney's hand and heard him call "Come on," to someone else, he ran and as he ran he heard a shot. He first went to his aunt's house and then to Henderson's where he stayed for half an hour before returning to his aunt's where he spent the night. He said Bardney came there and asked him to keep the shotgun for him. He finally told Bardney he could hide it on the back porch. The next morning he looked inside the refrigerator and was surprised to see two shotguns.

The jury accepted Mrs. Hayes' identification of Henderson as the youth who frisked her husband, but it had no assistance from her in determining who killed him. Thus, a crucial question before the jury was who fired the fatal shot, Allen or Bardney? Allen was indicted and

prosecuted, Bardney was not, but under the admissible evidence either could have been the slayer. Both were at the immediate scene of the crime. Bardney testified that Allen approached Hayes, and the murder weapon was found in Allen's possession. Allen testified that Bardney followed Hayes to the auto with a shotgun in his hand, Davis testified that he had seen a shotgun protruding from Bardney's sleeve and the murder weapon was owned by Bardney.

■■■ In this balanced situation it was essential that the scale not be tipped by improper evidence. It is Allen's contention that there were two instances of improper evidence; that he was prejudiced by the admission of two out-of-court statements implicating him in the crime. The first of these was a statement by Bardney that Allen carried a shotgun in the sleeve of his coat the night of the murder. Bardney's statement was disclosed to the jury as the result of a defense effort to impeach his credibility. Bardney testified that Allen was already in the store when he walked in. Allen's attorney confronted him with a contrary answer he had made to a question asked by an investigator: "We walked in the store and Charles Allen stepped in behind us in the store." On redirect examination the State, ostensibly to restore the credibility of its witness, read more of Bardney's answer:

> "Well, do you recall telling the investigator * * * in addition to what counsel read to you, 'We walked into the store, and Charles Allen stepped in behind us in the store. He had a sawed-off shotgun in his right sleeve of his coat. I saw the gun. I think it was a 16-guage shotgun. In the store was Charles Hayes' wife. Curtis Henderson threw a quarter on the counter and asked for a pop, and the store owner said, "If you're going to act this way, I ain't going to give him no pop * * *." ' "

Allen's attorney objected and the court instructed the jury,

> "* * * to disregard the answers of the witness with respect to the purchase of the pop, and whatever testimony was alluded to by this witness subsequent to the purchase of the pop, and throwing the coins down, and what the storekeeper said, or the individual who attempted to purchase the pop, and the conversations.
>
> You are to disregard that, do not consider it as evidence whatsoever."

Unfortunately, the court did not instruct the jury to disregard the damaging portion of the answer: that Allen carried a sawed-off shotgun when he entered the grocery store. Thus, the State succeeded in using Bardney's out-of-court statement as substantive evidence of Allen's guilt. The relevant rule is that when a witness has been impeached by proof

that he has made a prior inconsistent statement, his counsel may bring out all of the prior statement to qualify or explain the inconsistency and to rehabilitate the witness. (*People v. Hicks* (1963), 28 Ill. 2d 457, 192 N.E.2d 891.) Nothing in the portion of the statement read by the prosecutor either qualified or explained the inconsistency between Bardney's testimony and his prior statement. The reading of the full statement was a thinly disguised effort to get Bardney's incriminating statement before the jury under the guise of attempted rehabilitation. Similar attempts by the State to impart substantive character to extrajudicial, inconsisent statements have been repeatedly rejected. (See, *e.g., People v. Bailey* (1975), 60 Ill. 2d 37, 322 N.E.2d 804.) The trial court's instruction did not correct the State's error or mitigate its harm to Allen.

■■ An even more damaging error was the admission into evidence of an out-of-court statement by Henderson that Allen killed Hayes. The possibility that this oral statement, made when Allen was not present, might be injected into the case was recognized by everyone as a serious potential for error. It prompted Allen's attorney to request a severance. The trial court denied the request after being assured by the State that it was not its intention to use the statement, but that if it were used, Allen's name would be deleted. Before the trial began the State modified its position by stating that it intended to use the statement against Henderson but only after the court had determined which parts should be deleted. Persons jointly indicted for the commission of a crime should be tried together unless their defenses are of such an antagonistic nature that a severance is necessary to insure a fair trial. (*People v. Grilec* (1954), 2 Ill. 2d 538, 119 N.E.2d 232.) Whether a separate trial should be granted is largely within the judicial discretion of the trial court. (*People v. Wilson* (1963), 29 Ill. 2d 82, 193 N.E.2d 449.) A confession or admission by one defendant incriminating the other is ground for a severance unless the State promises either to avoid introducing the statement into evidence or to delete all references to the other defendant. *People v. Strayhorn* (1965), 35 Ill. 2d 41, 219 N.E.2d 517; *People v. Clark* (1959), 17 Ill. 2d 486, 162 N.E.2d 413; *People v. Bracken* (1966), 68 Ill. App. 2d 466, 216 N.E.2d 176.) The State made these promises and in view of its assurances it was not improper to deny Allen's motion for a severance.

Nevertheless, the jury was informed of Henderson's incriminating statement. Throughout the trial the possible use of the statement and the damage to Allen resulting from its use were discussed. As questions asked witnesses veered toward dangerous ground, Allen's attorney, outside the presence of the jury, repeatedly voiced his apprehensions to the court. The court admonished the questioners to be careful and cau-

tioned Officer Frank Radke, the policeman to whom Henderson had made the statement, to avoid mentioning his name. Despite these precautions, the damaging portion of Henderson's statement was disclosed to the jury at the very end of the trial. The background of the disclosure was this: After his arrest Henderson told Radke that he had seen Allen shoot Hayes. Radke showed him the sawed-off shotgun that had been found in the refrigerator and he said it was the one used in the shooting. Henderson, however, testified that he had not seen a shotgun that night. To impeach this testimony and Henderson's credibility, the State called Radke in rebuttal. Radke testified that he showed Henderson the shotgun and questioned him about it. An objection was made by Allen's attorney that Henderson's responses would be hearsay as to Allen. The court agreed and told the jury that the testimony the State was seeking to elicit from the witness should be disregarded as far as Allen was concerned, that it would relate only to Henderson. At the request of Allen's attorney a conference was held out of the jury's hearing and the court, for the second time, instructed Radke not to say anything about Allen. The trial was resumed and the prosecutor asked Radke what Henderson said when he was shown the shotgun on the evening of his arrest. Radke replied that Henderson said it was the shotgun used in the shooting.

In its examination of Radke, the State avoided asking any question that called for an answer implicating Allen. Henderson's attorney was less cautious. He apparently feared that the jury might infer from Radke's rebuttal testimony that Henderson himself used the shotgun, and in his cross-examination he asked Radke: "Did he [Henderson] tell you where he had seen the shotgun before?" and "Where did he say he had seen the shotgun before?" Allen's attorney objected and once more the court conferred with the attorneys outside of the hearing of the jury. Henderson's attorney argued that he had the right to bring out all of Henderson's statement in order to make it clear that his identification of the gun did not implicate him in the shooting. Allen's attorney said he had no objection to the officer testifying that Henderson said someone other than he had the gun as long as Allen's name was not mentioned. He requested the court to warn Radke against using Allen's name. The court asked Radke if his answer to the last question would involve Allen. Radke said it would. Henderson's attorney then agreed that he would ask Radke if Henderson said he saw the gun in the hands of another person. The court added this caveat: "As long as there is no identification." The prosecutor remarked that he thought the proper question to be asked was whether Henderson saw the gun at the time of the shooting. Henderson's attorney replied that he did not care when Henderson

saw the gun; what he wanted to make clear was that Henderson never had it.

At this point the trial judge abruptly changed his ruling. He stated that he would permit Radke to testify to whatever Henderson had said, including references to Allen "and let the jury make the determination." When a vigorous protest was made by Allen's attorney, the court rejoined, "Your man testified someone else did the shooting. I am going to let the testimony in." The cross-examination by Henderson's attorney was resumed before the jury. In response to the attorney's questions Radke stated that Henderson said he was outside the store and saw the shooting, and that the man who shot the victim was "Little Charles."

■■■ The court erred when it allowed Henderson's counsel to elicit from Radke his client's statement that "Little Charles" shot Hayes. A police officer's repetition of a codefendant's out-of-court statement implicating another defendant is hearsay when the statement is being used to prove the truth of the matter asserted in the statement. *Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723; *People v. Tyner* (1964), 30 Ill. 2d 101, 195 N.E.2d 675.) The whole point of the cross-examination was to establish the fact that Henderson did not have the shotgun himself—that he had seen it in someone else's hands. This could have been accomplished without revealing to the jury that Henderson accused Allen of the murder. When the court lowered the barrier and admitted the entire statement into evidence its effect was additional substantive proof of Allen's guilt. An out-of-court statement may be used to cast doubt on a witness' credibility, but it cannot be used for the purpose of proving a defendant's guilt. (*People v. Tate* (1964), 30 Ill. 2d 400, 197 N.E.2d 26; *People v. Yocca* (1967), 84 Ill. App. 2d 423, 228 N.E.2d 599.) No instruction was given to the jury, oral or written, limiting the purpose for which the statement was received in evidence. That it was Henderson's attorney, rather than the State, who brought out the hearsay evidence is irrelevant in appraising its detrimental effect on Allen. The ruling of the court opened the door for the evidence and Henderson's attorney, unconcerned with its effect on Allen, took advantage of the opening. Although the evidence at the trial was sufficient—if Bardney's testimony was believed—to prove Allen guilty beyond a reasonable doubt, the admission of the hearsay evidence was highly damaging to his defense and denied him a fair trial.

The judgment is reversed and the case is remanded for another trial.

Reversed and remanded.

McNAMARA and McGLOON, JJ., concur.